**IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR MANATEE COUNTY, FLORIDA**

KEVIN MICHAEL POWERS, and
TAMMY LEE POWERS,

Plaintiffs,

v.

CASE NO.:

SIG SAUER, INC., and
DANA SAFETY SUPPLY, INC.,

Defendants.
_______________________________________/

**JURY TRIAL DEMANDED**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**COME NOW** Plaintiffs, Kevin Michael Powers and Tammy Lee Powers, by and through undersigned and pursuant to Fla. R. Civ. P. 1.100, 1.201, *et seq.*, hereby file this civil action for recovery of harms, losses, and damages caused by the misconduct of Defendants, SIG SAUER, INC. and DANA SAFETY SUPPLY, INC., and in support thereof state:

1. In January 2016, firearm manufacturer, SIG SAUER, was warned that its newest handgun model—the P320—was capable of firing a round even without the trigger being pulled.

2. The timing of this warning could not have been worse—that same month, SIG SAUER was competing for a highly coveted U.S. ARMY contract worth up to $580,000,000.00.

3. SIG SAUER decided not to tell the public about the January 2016 warning.

4. Later, during U.S. ARMY testing, SIG SAUER was again warned—this time by U.S. military officials—that the P320 platform was defective, capable of involuntarily misfiring.

5. Again, SIG SAUER decided not to tell the public about the U.S. ARMY's warning.

6. Instead, SIG SAUER quietly "fixed" the military's P320, while continuing to sell defective P320s to consumers and domestic law enforcement officials alike.

7. One such defective SIG SAUER P320 (S/N: 58A010718) was distributed by

DANA SAFETY SUPPLY to the Holmes Beach Police Department who, in turn, issued the firearm to an experienced 49-year-old Sergeant named Kevin Powers.

8. Sgt. Powers, a U.S. military and domestic law enforcement veteran, received his assigned P320 without ever being informed—by SIG SAUER or anyone else—of the deadly defects hidden inside.

9. In the early morning hours of November 29, 2016, that SIG SAUER P320 misfired—without the trigger ever being pulled—sending a .40 caliber round tearing into the left leg of Sgt. Powers, shattering his tibia and tearing through two arteries before coming to rest inside his left calf.

10. Sgt. Powers' wife and young son responded to his aid in the bedroom, calling for an ambulance, and likely saving the life of Sgt. Powers.

11. This action is brought for recovery of damages stemming from harms, losses, and injuries sustained by Sgt. Kevin Michael Powers and the harms and losses sustained by Tammy Lee Powers, with express reservation of right to amend to add claims for Punitive Damages in accordance with Florida law.

**JURISDICTION AND VENUE**

12. This is an action for damages that exceed $30,000.00—the minimum jurisdictional limits of this court, exclusive of interest and costs—and, although Plaintiffs' were required to and did file a Civil Cover Sheet stating an "Amount of Claim" figure, that figure is expressly for the purposes of data collection and clerical processing; the full amount of damages at issue in this action must be decided by a duly empaneled jury per Article I, Section 21 of the Florida Constitution.

13.     At all times material hereto, Defendant, SIG SAUER, INC. ("SIG SAUER"), was and is a Foreign Profit Corporation authorized and doing business in the State of Florida with a registered agent located at 115 North Calhoun Street, Suite 4, Tallahassee, Florida 32301.

14.     At all times material hereto, SIG SAUER voluntarily submitted itself to the jurisdiction of this Court by doing—personally or through agents—one or more of the following:

a.   **SPECIFIC JURISDICTION:** Operating, conducting, engaging in, or carrying on a business or business venture in Florida, including by maintaining business interests and "authorized" firearm dealerships in the state of Florida, including but not limited to: 4850 Lawing Lane in Orlando, 4988 CR-44A in The Villages, 404 S. Harbor City Blvd. in Melbourne, and 525 FL-16 #129 in St. Augustine; and/or

b.   **SPECIFIC JURISDICTION:** Having an office or agency in Florida, including through the maintenance of business interests and "authorized" firearm dealerships in the state of Florida, including but not limited to: 4850 Lawing Lane in Orlando, 4988 CR-44A in The Villages, 404 S. Harbor City Blvd. in Melbourne, and 525 FL-16 #129 in St. Augustine; and/or

c.   **SPECIFIC JURISDICTION:** Committing a tortious act within Florida, which includes but is not limited to: the supply, sale, and/or distribution of defective products including those which were defectively designed, manufactured, and/or which contain defective warnings or lack of warning post-sale and whereby, the exercise of control or lack thereof in the process of supplying and not recalling defective equipment and further in failing to warn those who might reasonably be damaged by the aforementioned defect(s) constitutes tortious conduct under Florida law; and/or

d.   **SPECIFIC JURISDICTION:** Causing injury to persons within Florida which arose out of an act or omission by Defendant even while outside Florida where, at the time of the injury, Defendant was engaged in solicitation or service activities within Florida, which include business interests and "authorized" firearm dealerships in the state of Florida, including but not limited to: 4850 Lawing Lane in Orlando, 4988 CR-44A in The Villages, 404 S. Harbor City Blvd. in Melbourne, and 525 FL-16 #129 in St. Augustine; and/or

e. **SPECIFIC JURISDICTION:** Breaching a contract in Florida by failing to perform acts required by the contract to be performed in this state, including the provision of reasonably safe and non-defective equipment to Florida governmental agencies and/or in the operation of business interests and "authorized" firearm dealerships in the state of Florida, including but not limited to: 4850 Lawing Lane in Orlando, 4988 CR-44A in The Villages, 404 S. Harbor City Blvd. in Melbourne, and 525 FL-16 #129 in St. Augustine; and

f. **GENERAL JURISDICTION:** Engaging in substantial and not isolated activity within Florida, including through business interests and "authorized" firearm dealerships in the state of Florida, including but not limited to: 4850 Lawing Lane in Orlando, 4988 CR-44A in The Villages, 404 S. Harbor City Blvd. in Melbourne, and 525 FL-16 #129 in St. Augustine, entering agreements in contract, control (or lack thereof) over employees/agents, advertising, physical visitations to the state, engagement in solicitation activities, and/or engagement in service activities.

*See* §48.193, FLA. STAT. (2019).

15. Accordingly, at all times material hereto, SIG SAUER voluntarily submitted itself to the jurisdiction of this Court and, as a result, SIG SAUER is subject to this Court's jurisdiction.

16. At all times material hereto, Defendant, DANA SAFETY SUPPLY, INC. ("DANA SUPPLY"), was and is Florida Limited Liability Company, with a principal place of business at 561 Stevens Street, Jacksonville, Florida 32254.

17. Accordingly, at all times material hereto, DANA SUPPLY voluntarily submitted itself to the jurisdiction of this Court.

18. At all times material hereto, Kevin Michael Powers, was and is *sui juris* and a resident of Manatee County, Florida.

19. At all times material hereto, Tammy Lee Powers, was and is *sui juris* and a resident of Manatee County, Florida.

20. Venue is proper in Manatee County, Florida because the Involuntary Misfire and corresponding injury occurred—and therefore the cause of action accrued—within the boundary of Manatee County, Florida. *See* §47.011, FLA. STAT. (2019).

**ALLEGATIONS COMMON TO ALL COUNTS**

21. In January of 2016, SIG SAUER was very clearly informed that the P320 firearm platform was capable of an involuntary misfire—an extremely dangerous condition capable of killing anyone within range of a bullet.

22. At that time, SIG SAUER knew enough about the design, manufacture, and sale of firearms to know that such a condition constitutes a dangerous and defective condition requiring immediate corrective action and warning to consumers and end users.

23. SIG SAUER decided not to tell the public about the January 2016 warning.

24. Later, in April of 2016, U.S. ARMY Operational Test and Evaluation ("DOTE") personnel notified SIG SAUER that testing had confirmed what SIG SAUER was told just three (3) months earlier—the P320 (dubbed the "XM17/XM18" for military testing) was capable of an involuntary misfire without warning.

25. In that three (3) month period in early 2016, SIG SAUER decided not to tell the general public or U.S. ARMY personnel about the potential for involuntary misfire—endangering the lives and safety of everyone involved in the XM-series range testing.

26. Meanwhile, SIG SAUER continued to market and sell the P320 platform, making false and/or misleading statements repeatedly, including false and/or misleading statements about the safety capabilities of the weapons platform.

27. SIG SAUER singled-out U.S. law enforcement agencies for the purchase and sale of P320 firearms, going so far as to give "free" P320s to some domestic law enforcement agencies, including agencies in the state of Florida.

28. SIG SAUER knew those law enforcement agencies employed officers and deputies who, at the time of each sale and purchase, were engaged in ongoing ultrahazardous employment activities inherent in their employment; SIG SAUER knew those officers and deputies would rely on the P320 to potentially save their own lives.

29. Specifically, SIG SAUER knew those same law enforcement officers were uniquely at risk for injury or death caused by any defect present within SIG SAUER's firearms, including for the following reasons:

a. Law enforcement officers are required to carry sidearms—like the P320—in order to perform their job duties;

b. Law enforcement officers are required to carry their sidearms—like the P320—with "one in the chamber," an industry term referring to a live round retained inside the chamber of the weapon, i.e.: the weapon is loaded and ready to fire with a single pull of the trigger and without the need to "charge" the weapon prior to discharging it;

c. Law enforcement officers carry sidearms—like the P320—on their hip, near critical and life-sustaining organs and pulmonary systems;

d. Law enforcement officers carry sidearms—like the P320—for extended periods of time;

e. Law enforcement officers carry sidearms—like the P320—while moving around innocent bystanders including children in the case of school resource officers;

f. Law enforcement officers carry sidearms—like the P320—on their hip while entering and exiting vehicles, a task which inherently requires bending at the waist;

g. Law enforcement officers carry sidearms—like the P320—while simultaneously being required to wear a seatbelt when operating an automobile;

h. Law enforcement officers carry sidearms—like the P320—while responding to emergencies and pursuing suspects, tasks which "jostle" or otherwise move weapons around;

i. Law enforcement officers carry sidearms—like the P320—while traversing uneven terrain including in situations where officers may fall down, a fact made imminently clear to SIG SAUER at SIG SAUER's own "SIG SAUER Academy," a tactical firearm training facility located at 2216, 233 Exeter Road in Epping, New Hampshire, where SIG SAUER employees have planned, directed, and supervised training drills which explicitly involved the risk of falling and bumping firearms; and

j. Law enforcement officers carry sidearms—like the P320—which have been chosen *for them*, i.e.: officers can rarely choose their own sidearm and, as a result, they are "Captive Users" relying on senior officials to choose safe weapons platforms on behalf of individual officers.

30. With knowledge of the foregoing, SIG SAUER continued to active pursue law enforcement contracts for the purchase and sale of P320s—including the P320 which is subject of this lawsuit— while knowing the defective condition of the P320 weapons platform being sold, all in exchange for profits.

**THE SUBJECT MISFIRE**

31. In the evening of November 28, 2016, Sgt. Kevin Powers reported to his job as a member of law enforcement with the City of Holmes Beach Police Department.

32. In his capacity as a Sergeant with the Holmes Beach Police Department, Sgt. Powers was required to carry a loaded firearm with one in the chamber—in this case, a department-issued SIG SAUER P320 handgun.

33. After completing his shift, Sgt. Powers returned home around 6:00 a.m. on November 29, 2016.

34. While his wife and young son began preparing for their day, Sgt. Powers entered the master bedroom in order to change out of his law enforcement uniform and to safely secure his department-issued equipment.

35. As he had thousands of times before, Sgt. Powers began the process of removing and making safe the weapons and other dangerous implements he was required to carry by virtue of his employment with the City of Holmes Beach Police Department.

36. Specifically, Sgt. Powers attempted to make safe the handgun issued to him by the City of Holmes Beach Police Department, a process Sgt. Powers had performed daily for years.

37. This is in part because, for many years, Sgt. Powers and his wife, Tammy Powers, had one or more small children present in the home—children shared in the marriage and whom both Sgt. Powers and Tammy wished to keep safe.

38. Never before had Sgt. Powers experienced any issues with making safe the firearms issued to him by law enforcement agencies—firearms which included Smith & Wesson's 910 and the Smith & Wesson M&P platform.

39. Critically, on the date of injury, Sgt. Powers had only recently been issued the.40 caliber SIG SAUER P320 pistol (bearing S/N: 58A010718) which is subject of the instant action (referred to hereinafter as the "SUBJECT HANDGUN").

40. On November 29, 2016, Sgt. Powers removed the SUBJECT HANDGUN from the department-issued holster without ever touching the trigger.

41. In so doing, Sgt. Powers removed the magazine from the magazine well of the SUBJECT HANDGUN—a common step in making safe any magazine-fed firearm.

42.     This left only one live round inside the SUBJECT HANDGUN—a round still "in the chamber," as required by department policy and consistent with firearm safety best practices.

43.     Sgt. Powers attempted to eject the final live round by pulling the slide of the SUBJECT HANDGUN backwards, bringing the weapon to its "out-of-battery" state—a state which should never allow a round to discharge.

44.     Taking the SUBJECT HANDGUN "out-of-battery" is yet another common step to making a firearm safe, and one which Sgt. Powers was required to perform in order to remove the final live round from the chamber of the SUBJECT HANDGUN.

45.     As Sgt. Powers attempted to take the SUBJECT HANDGUN out-of-battery, but before the final live round would fully eject, the slide on the SUBJECT HANDGUN slid forward.

46.     On a non-defective firearm, this process would never discharge a live round.

47.     In fact, most modern firearms are designed with safety systems that prevent any round from discharging while the firearm is "out-of-battery."

48.     Unfortunately, the P320 platform line as designed and manufactured prior to August 2017—including the SUBJECT FIREARM—were capable of firing out-of-battery.

49.     When the slide on the SUBJECT HANDGUN moved forward, the defects present within the P320 platform and SUBJECT FIREARM—then unknown to Sgt. Powers—caused the firing pin to move forward without the trigger ever being pulled, striking the primer and firing the live round down into the left leg of Sgt. Powers just above the knee cap (hereinafter referred to as the "Involuntary Misfire").

## THE DEFECTIVE FIREARM

50. One or more defective systems within SIG SAUER's P320 platform line, as designed and manufactured prior to August 2017—including the SUBJECT HANDGUN—permitted the firing of a live round into the body of Sgt. Powers without the trigger of the SUBJECT HANDGUN ever being pulled; those defective systems include:

a. The SUBJECT HANDGUN was designed and manufactured with a inadequately designed trigger with excessive mass relative to the force holding the trigger in place, such that the excessive mass was capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped with original triggers (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s); and

b. The SUBJECT HANDGUN was designed and manufactured with an inadequately designed disconnector and sear assembly capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped with original disconnectors and/or sear assemblies (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s); and

c. The SUBJECT HANDGUN was designed and manufactured with an inadequately designed striker assembly with excessive mass and without widely accepted safety features incorporated therein, such that the striker was capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped with original striker assemblies (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s); and

d. The SUBJECT HANDGUN was designed and manufactured with a inadequately designed firing mechanism with failure-prone angles, inertia, and rotational pin placement, all capable

of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped with original firing mechanisms (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s).

51. Additionally, critical safety systems were conspicuously *absent* from SIG SAUER's P320 platform line, as designed and manufactured prior to August 2017—including the SUBJECT HANDGUN—permitted the firing of a live round into the body of Sgt. Powers without the trigger of the SUBJECT HANDGUN ever being pulled; those absent safety systems include:

a. The SUBJECT HANDGUN was designed and manufactured without any external "safety lever," thereby rendering P320-platform firearms capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped without external "safety levers" (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s); and

b. The SUBJECT HANDGUN was designed and manufactured without any "trigger safety" or "trigger bar safety" standard, thereby rendering P320-platform firearms capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped without a "trigger safety" or "trigger bar safety" (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s); and

c. The SUBJECT HANDGUN was designed and manufactured without an adequate disconnector assembly, thereby rendering P320-platform firearms capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped without proper disconnector assemblies (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a

"bump," "tap," "drop," or external force from foreign object(s); and

d. The SUBJECT HANDGUN was designed and manufactured without any restriction on upward or forward sear movement, thereby rendering P320-platform firearms capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped without external "safety levers" (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s); and

e. The SUBJECT HANDGUN was designed and manufactured without any milled "take-down" notch, thereby rendering P320-platform firearms capable of causing primer impact on live ammunition even when the trigger is not pulled voluntarily; this condition permits P320-platform firearms equipped without a milled "take-down" notch (including the SUBJECT HANDGUN) to discharge upon forward force, regardless of whether that force is the forward momentum of the slide, a "bump," "tap," "drop," or external force from foreign object(s).

52. On the date and at the time Sgt. Powers was critically injured in the Involuntary Misfire caused by the SUBJECT HANDGUN, SIG SAUER knew the aforementioned defects caused deficiencies and the potential for misfires without warning.

53. At no point did SIG SAUER warn or attempt to warn Sgt. Powers, his employer, his superiors or co-workers, or any member of the general public about the defective and dangerous condition within P320 platform firearms, including those sold and distributed to the general public and members of law enforcement after the date SIG SAUER was first warned of the same.

**THE REPRESENTATIONS**

54. Instead, at least as early as 2015, SIG SAUER spent large sums of money developing and marketing a "SAFETY WITHOUT COMPROMISE" advertising campaign.

55. The "SAFETY WITHOUT COMPROMISE" campaign was published alongside the earliest P320 models, consisting of false or misleading statements which were inconsistent with information known to SIG SAUER at the same time:

SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

SAFETY WITHOUT COMPROMISE
We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

56. While SIG SAUER reassured the public the P320 was safe "without compromise," SIG SAUER continued to learn of ever-increasing numbers of misfire events involving the P320, including both drop and non-drop related misfires.

57. Even with multiple confirmed events, SIG SAUER told the public, as late as August 2017, that there had been "zero [0]" incidents:

UPDATED 8/05/17: Sig Sauer has released the following statement.

" *"In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System [MHS], Sig Sauer, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero [0] reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.*

58. SIG SAUER knew this statement was inaccurate or, at least extremely misleading, at the time SIG SAUER made the statement publicly on August 5, 2017.

## THE INTERNAL "INVESTIGATIONS"

59. At least as early as 2016, members of SIG SAUER's management team began "investigating" claims of involuntary misfires.

60. These investigations involved SIG SAUER employees visiting local law enforcement agencies which had experienced or reported a misfire event to SIG SAUER directly, of which there were several.

61. However, rather than seek to learn facts and details surrounding the dangerous propensity of the P320 firearm platform, SIG SAUER's management **actively avoided learning the details of involuntary misfire events.**

62. In an email exchange, one SIG SAUER manager investigating a misfire freely admits, "… I did not want to see anything they did not want me to see."

63. At the same time, SIG SAUER provided items of value to individuals with knowledge of involuntary P320 misfires.

64. The discord between SIG SAUER's public representations and its private knowledge evidences a conscious disregard for the lives and safety of members of the public through a coordinated public relations campaign orchestrated by SIG SAUER

65. All the while, SIG SAUER privately struggled to engineer a "fix" which could prevent the P320 from unintentionally misfiring.

## THE "VOLUNTARY UPGRADE" PROGRAM

66. On August 7, 2017,[1] a journalist named Andrew Tuohy published a news story on a popular recreation website, Omaha Outdoors, entitled simply, "*Sig Sauer P320 Fails Drop Test.*"

[1] At no time prior to August 5, 2017, did SIG SAUER ever publicly comment or acknowledge even the possibility that any P320 could fire without the trigger being pulled.

67. Despite the understated title, Tuhoy's story set off a firestorm in online firearm enthusiast communities, highlighted by Tuhoy's ability to easily and repeatedly show a SIG SAUER P320 misfiring under many different conditions, all without the trigger ever being pulled.

68. Less than twenty-four (24) hours after Tuhoy's story went live online, SIG SAUER published a series of "changes" to the beleaguered P320—changes which SIG SAUER claimed were part of a "Voluntary Upgrade Program" (herein after referred to as the "V/U Program") and ***not*** a recall.

69. SIG SAUER unveiled the V/U Program on August 8, 2017.

70. SIG SAUER unveiled the V/U Program without ever admitting anything was wrong with the P320 in the first place.

71. SIG SAUER's V/U Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while additionally adding a mechanical disconnector," apparently out of the goodness of SIG SAUER's heart.

72. In reality, SIG SAUER's V/U Program was intended to correct defective systems within several hundred thousand P320-platform firearms (of which the SUBJECT HANDGUN was one), while also denying to consumers and the public thanye dangers inherent in the "non-upgraded" P320-platform firearms.

73. SIG SAUER's V/U Program changes—once made to a P320—make that P320 safer that it was before the changes.

74. If the changes instituted during SIG SAUER's V/U Program had been applied to the SUBJECT FIREARM prior to November 29, 2016, the SUBJECT FIREARM would not have discharged.

75. In the words of SIG SAUER, these V/U Program "changes" represented an "alternate design" (referred to herein as "ALTERNATE DESIGN P320").

76. On the date the V/U Program and ALTERNATE DESIGN P320 was announced, SIG SAUER had actual knowledge of the defects described herein for at least twenty (20) months.

77. Distributor, DANA SUPPLY, had access to some or all of the aforementioned information and failed to prevent the sale of P320s, including the SUBJECT HANDGUN.

78. DANA SUPPLY sold the SUBJECT HANDGUN without inspection, repair, or warning of the aforementioned conditions or risks associated therewith.

**COUNT I**
**<u>NEGLIGENCE OF SIG SAUER, INC.</u>**

79. Plaintiffs reallege paragraphs 1 through 78, as if fully set forth herein.

80. Prior to the Involuntary Misfire, SIG SAUER knew—or in the exercise of due care, should have known—that the SUBJECT HANDGUN would be used in the condition and manner in which the SUBJECT HANDGUN was used on the day and at the time of the Involuntary Misfire.

81. Accordingly, SIG SAUER created a foreseeable zone of risk that ordinary users of the SUBJECT HANDGUN and all bystanders within range of a bullet would be harmed by the SUBJECT HANDGUN, including by one or more of the unreasonably dangerous conditions present within the SUBJECT HANDGUN, as outlined herein.

82. More egregiously, SIG SAUER targeted law enforcement officers, members of the U.S. Military, and domestic intelligence officers—individuals at a higher risk of being struck, injured, and/or killed by a defective firearm and who use their assigned firearms under the most extreme conditions—thereby creating a heightened foreseeable zone of risk that the

aforementioned individuals and all bystanders within range of a bullet would be harmed by the SUBJECT HANDGUN, including by one or more of the unreasonably dangerous conditions present within the SUBJECT HANDGUN, as outlined herein.

83.     Specifically, SIG SAUER created a foreseeable zone of risk that users—including Sgt. Powers—as well as bystanders near the SUBJECT HANDGUN would be catastrophically injured or killed by any involuntary misfire of the SUBJECT HANDGUN, including during use, handling, movement, assembly, disassembly, loading, or unloading of the same.

84.     Such an involuntary misfire was foreseeable to SIG SAUER, as SIG SAUER had designed and manufactured the SUBJECT HANDGUN in such a way as to freely permit involuntary misfire during use, handling, movement, assembly, disassembly, loading, or unloading—a condition which serves no utility whatsoever.

85.     At the same time that SIG SAUER foresaw involuntary misfires, SIG SAUER knowingly embarked on a marketing campaign which mislead the general public as well as hundreds of thousands of end users, including Sgt. Powers and other Captive Users—law enforcement officers, members of the U.S. Military, and domestic intelligence officers—who were powerless to select a weapon of their own choosing.

86.     Beyond the Captive Users, SIG SAUER misrepresented information to police departments and sheriff's offices across the United States, misstating or omitting critical facts then known to SIG SAUER.

87.     Ultimately, SIG SAUER's marketing campaign discouraged end users from searching out and/or selecting safer alternatives to the P320 handgun platform, while also discouraging end users from taking part in SIG SAUER's "Voluntary Upgrade" program.

88.     On November 29, 2016, SIG SAUER's product—the SUBJECT HANDGUN—misfired while being handled in accordance with all accepted handgun safety practices, resulting in the serious and permanent injury of Sgt. Kevin Powers.

89.     **DUTY.** Defendant, SIG SAUER, had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings and instructions for, package, distribute, and sell the SUBJECT HANDGUN in a reasonably safe condition so as not to present a danger to end users—including Sgt. Powers—and/or bystanders who reasonably and expectedly, under ordinary circumstances, would come into contact with the SUBJECT HANDGUN.

90.     **BREACH.** Defendant, SIG SAUER, breached its duty to Plaintiff in one or more of the following ways:

    a. Designing the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including through:

       i. Failing to design an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

       ii. Failing to design a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

       iii. Failing to design adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

       iv. Failing to design adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

       v. Failing to design the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

       vi. Failing to adequately design the internal components of the SUBJECT HANDGUN so as to prevent the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii. Failing to design component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

viii. Failing to design the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN;

ix. Permitting the SUBJECT HANDGUN to be manufactured without one or more of the foregoing conditions rectified; and/or

x. Failing to recall the SUBJECT HANDGUN as defectively designed or, alternatively, to warn of the same.

b. Manufacturing the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including through:

i. Failing to manufacture the SUBJECT HANDGUN with an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii. Failing to manufacture the SUBJECT HANDGUN with a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii. Failing to manufacture the SUBJECT HANDGUN with adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv. Failing to manufacture the SUBJECT HANDGUN with adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v. Failing to manufacture the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi. Failing to manufacture the SUBJECT HANDGUN with internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii. Failing to manufacture the SUBJECT HANDGUN with component parts of proper size, dimension, and weight

so as to prevent involuntary misfire of the SUBJECT HANDGUN;

viii.   Failing to manufacture the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN;

ix.   Failing to manufacture the SUBJECT HANDGUN without one or more of the foregoing conditions rectified; and/or

x.   Failing to recall the SUBJECT HANDGUN as defectively manufactured or, alternatively, to warn of the same.

c.   Selling the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including through:

i.   Failing to sell the SUBJECT HANDGUN with an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii.   Failing to sell the SUBJECT HANDGUN with a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii.   Failing to sell the SUBJECT HANDGUN with adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv.   Failing to sell the SUBJECT HANDGUN with adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v.   Failing to sell the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi.   Failing to sell the SUBJECT HANDGUN with internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii.   Failing to sell the SUBJECT HANDGUN with component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

viii.   Failing to sell the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which

are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN; and/or

ix.  Failing to sell the SUBJECT HANDGUN without one or more of the foregoing conditions rectified.

d.  Making the SUBJECT HANDGUN and component parts available to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users, without adequate warning of the unreasonably dangerous and defective nature of the SUBJECT HANDGUN permitting the SUBJECT HANDGUN to involuntarily misfire, including through:

i.  Failing to adequately warn of the lack of external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii.  Failing to adequately warn of the lack of trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii.  Failing to adequately warn of the lack of adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv.  Failing to adequately warn of the lack of redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v.  Failing to adequately warn of the lack of safety systems capable of preventing a discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi.  Failing to adequately warn of the lack of internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii.  Failing to adequately warn of the use of component parts which were improperly sized, of incorrect dimension, and which were far too heavy, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable;

viii.  Failing to adequately warn of the use of raw materials which were not capable of enduring the ordinary forces associated with repeated cartridge discharge, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable; and/or

ix. Failing to warn that the SUBJECT HANDGUN was being sold without one or more of the foregoing conditions rectified.

e. Marketing, promoting, advertising, and representing to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users that the SUBJECT HANDGUN was reasonably safe for use, handling, movement, assembly, disassembly, loading, and unloading when, in reality, basic and reasonably foreseeable use causes the SUBJECT HANDGUN to involuntarily misfire;

f. Marketing, promoting, advertising, and representing to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users that the SUBJECT HANDGUN was reasonably safe for use, handling, movement, assembly, disassembly, loading, and unloading when, in reality, a safer alternative was readily available and feasible—including but not limited to the "light-weight striker" which SIG SAUER readily admits was, prior to November 29, 2016, limited to "higher end 320s, like the X-Series line," and which SIG SAUER intentionally made more expensive in exchange for, *inter alia*, safety systems;

g. Failing to design and manufacture the SUBJECT HANDGUN in such a way as to restrict, limit, or prevent the possibility of involuntary misfire of the SUBJECT HANDGUN, even in the event of inadequate or non-existent maintenance;

h. Improperly assembling, inspecting, and testing the SUBJECT HANDGUN, including prototypes in the design stage, such that foreseeable use could permit involuntary misfire of the SUBJECT HANDGUN without remedying or warning of the risk of involuntary misfire;

i. Failing to properly design, manufacture, assemble, test, inspect, label, package, and otherwise place the SUBJECT HANDGUN on the market for sale in a defect-free condition, thereby creating an unreasonable danger of injury or death to users and bystanders within range of a bullet, even under normal and foreseeable circumstances;

j. Failing to warn, notice, or alert purchasers and users (or doing so inadequately) either before, during, and/or after the sale of the SUBJECT HANDGUN through reasonably informative and effective instructional materials, stickers, placards, and/or other

                    documentation regarding hazardous conditions, including those described herein;

k. Failing to instruct (or inadequately instructing) buyers, installers, inspectors, maintenance providers, contractors, and eventual owners or end users of the SUBJECT HANDGUN with regard to proper handling, use, assembly, disassembly, loading, and unloading of the SUBJECT HANDGUN;

l. Failing to inspect, test, review, or examine the SUBJECT HANDGUN, including all component parts to ensure the SUBJECT HANDGUN would operate in a reasonably safe manner when the SUBJECT HANDGUN left SIG SAUER's possession; and/or

m. Failing to use due care in the manufacture, design, marketing, distribution, sale, testing, or servicing of the SUBJECT HANDGUN, including its component parts, in such a way to render the SUBJECT HANDGUN not reasonably safe for any use.

91. **CAUSATION.** The negligence of SIG SAUER, described above, did directly and proximately cause the injuries suffered by Sgt. Kevin Powers, and thus the damages of Plaintiffs, in that SIG SAUER's negligence did directly, in natural and continuous sequence, produce or contribute substantially to the physical injuries and associated damages of Plaintiffs.

92. **DAMAGES.** As a direct and proximate result of the SIG SAUER's negligence, Sgt. Kevin Powers was injured in and about the body and suffered, *inter alia*: permanent injury, disability, disfigurement, scarring, pain and suffering, aggravation of preexisting conditions, loss of past wages, loss of future earning capacity, mental anguish, loss of enjoyment of life, and medical expenses in the care of treatment of said injuries. All injuries are permanent within a reasonable degree of medical probability and will require future medical treatment. Plaintiffs will continue to suffer damages in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, SIG SAUER, INC., including for an award of damages in an amount in excess of the jurisdictional limit of this Court—

thirty thousand dollars—and for all other damages to which Plaintiffs are legally entitled, along with all fees, costs, and interest as allowable by law, and for all other such other relief as this Honorable Court deems just and proper. Respectfully, Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

**COUNT II**
**STRICT LIABILITY OF SIG SAUER, INC.**

93. Plaintiffs reallege paragraphs 1 through 78, as if fully set forth herein.

94. **THE BUSINESS.** Defendant, SIG SAUER, is engaged in the business of designing, manufacturing, marketing, advertising, selling, and distributing firearms, including the SUBJECT HANDGUN as part of the "P320" handgun platform sold by SIG SAUER since approximately 2014.

95. **THE PRODUCT.** SIG SAUER placed the SUBJECT HANDGUN on the market along with approximately 500,000 other P320s knowing that the SUBJECT HANDGUN was reasonably likely to be used without inspection for defects and dangers by the end user.

96. Specifically, SIG SAUER knew or should have known that end users would not and could not properly inspect the SUBJECT HANDGUN for defects and dangerous conditions and that the detection of such defects and dangers would be beyond the capabilities of such persons.

97. **THE DEFECTS.** The SUBJECT HANDGUN was defective and unreasonably dangerous to end users—including Sgt. Powers—as well as bystanders within range of a bullet at the time that SIG SAUER designed, manufactured, marketed, sold, and/or distributed the SUBJECT HANDGUN and, at that same time, the SUBJECT HANDGUN was defective in one or more of the following ways:

a. **Design Defect.** SIG SAUER designed the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including by:

    i. Failing to design an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    ii. Failing to design a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    iii. Failing to design adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    iv. Failing to design adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    v. Failing to design the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

    vi. Failing to adequately design the internal components of the SUBJECT HANDGUN so as to prevent the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

    vii. Failing to design component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

    viii. Failing to design the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN;

    ix. Permitting the SUBJECT HANDGUN to be manufactured without one or more of the foregoing conditions rectified;

    x. Failing to properly assemble, inspect, and test, prior to November 29, 2016, the entire P320 line including prototypes and the design stage and other similar weapons platforms like the P250, such that ordinary use would permit the SUBJECT HANDGUN to involuntarily misfire without warning; and/or

    xi. Failing to recall the SUBJECT HANDGUN as defectively designed or, alternatively, to warn of the same.

b. **Manufacturing Defect.** SIG SAUER manufactured the SUBJECT HANDGUN and component parts in such an

unreasonably dangerous and defective manner as to permit the
SUBJECT HANDGUN to involuntarily misfire, including by:

   i.    Failing to manufacture the SUBJECT HANDGUN with
an external safety capable of preventing involuntary
misfire of the SUBJECT HANDGUN;

   ii.    Failing to manufacture the SUBJECT HANDGUN with
a trigger safety capable of preventing involuntary misfire
of the SUBJECT HANDGUN;

   iii.    Failing to manufacture the SUBJECT HANDGUN with
adequate internal safety mechanisms capable of
preventing involuntary misfire of the SUBJECT
HANDGUN;

   iv.    Failing to manufacture the SUBJECT HANDGUN with
adequate redundant safeties or similar devices capable of
preventing involuntary misfire of the SUBJECT
HANDGUN;

   v.    Failing to manufacture the SUBJECT HANDGUN in
such a manner as to prevent any discharge when the
SUBJECT HANDGUN is capable of an involuntary
misfire;

   vi.    Failing to manufacture the SUBJECT HANDGUN with
internal components capable of preventing the
movement of any firing mechanism internal component
part unless the trigger is first pulled, thereby preventing
involuntary misfire of the SUBJECT HANDGUN;

   vii.    Failing to manufacture the SUBJECT HANDGUN with
component parts of proper size, dimension, and weight
so as to prevent involuntary misfire of the SUBJECT
HANDGUN;

   viii.    Failing to manufacture the SUBJECT HANDGUN in
such a manner as to require the use of only raw materials
which are capable of enduring the ordinary forces
associated with repeated cartridge discharge without also
permitting involuntary misfire of the SUBJECT
HANDGUN;

   ix.    Failing to manufacture the SUBJECT HANDGUN
without one or more of the foregoing conditions
rectified;

   x.    Failing to properly assemble, inspect, and test the
SUBJECT HANDGUN such that ordinary use would
permit the SUBJECT HANDGUN to involuntarily
misfire without warning; and/or

   xi.    Failing to recall the SUBJECT HANDGUN as
defectively manufactured or, alternatively, to warn of the
same.

c. **Sale/Distribution of Defective Product.** SIG SAUER sold and/or distributed the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including by:

    i.    Failing to sell the SUBJECT HANDGUN with an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    ii.    Failing to sell the SUBJECT HANDGUN with a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    iii.    Failing to sell the SUBJECT HANDGUN with adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    iv.    Failing to sell the SUBJECT HANDGUN with adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

    v.    Failing to sell the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

    vi.    Failing to sell the SUBJECT HANDGUN with internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

    vii.    Failing to sell the SUBJECT HANDGUN with component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

    viii.    Failing to sell the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN; and/or

    ix.    Failing to sell the SUBJECT HANDGUN without one or more of the foregoing conditions rectified.

d. **Failure to Warn of Defective Product.** SIG SAUER made the SUBJECT HANDGUN and component parts available to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users, without adequate warning of the unreasonably dangerous and defective nature of the SUBJECT HANDGUN permitting the SUBJECT HANDGUN to involuntarily misfire, including by:

i. Failing to adequately warn of the lack of external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii. Failing to adequately warn of the lack of trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii. Failing to adequately warn of the lack of adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv. Failing to adequately warn of the lack of redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v. Failing to adequately warn of the lack of safety systems capable of preventing a discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi. Failing to adequately warn of the lack of internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii. Failing to adequately warn of the use of component parts which were improperly sized, of incorrect dimension, and which were far too heavy, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable;

viii. Failing to adequately warn of the use of raw materials which were not capable of enduring the ordinary forces associated with repeated cartridge discharge, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable; and/or

ix. Failing to warn that the SUBJECT HANDGUN was being sold without one or more of the foregoing conditions rectified.

e. **Post-Sale Duty to Warn of Defective Product.** After learning of the dangerous and defective condition of its P320 platform—including and affecting the Subject Firearm—SIG SAUER failed to adequately warn anyone of the unreasonably dangerous and defective nature of the SUBJECT HANDGUN permitting the SUBJECT HANDGUN to involuntarily misfire, including by:

i. Failing to adequately warn of the lack of external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii.   Failing to adequately warn of the lack of trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii.   Failing to adequately warn of the lack of adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv.   Failing to adequately warn of the lack of redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v.   Failing to adequately warn of the lack of safety systems capable of preventing a discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi.   Failing to adequately warn of the lack of internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii.   Failing to adequately warn of the use of component parts which were improperly sized, of incorrect dimension, and which were far too heavy, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable;

viii.   Failing to adequately warn of the use of raw materials which were not capable of enduring the ordinary forces associated with repeated cartridge discharge, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable; and/or

ix.   Failing to warn that the SUBJECT HANDGUN was being sold without one or more of the foregoing conditions rectified.

f.   **Marketing and Advertising.** SIG SAUER marketed, promoted, advertised, or otherwise represented that the SUBJECT HANDGUN was reasonably safe for use, handling, movement, assembly, disassembly, loading, and unloading when, in reality, foreseeable use alone permits the SUBJECT HANDGUN to involuntarily misfire; in so doing, SIG SAUER marketed, promoted, advertised, and represented that the SUBJECT HANDGUN was reasonably safe for use, handling, movement, assembly, disassembly, loading, or unloading when, in reality, a safer alternative was readily available and feasible from SIG SAUER, but that that safer alternative was intentionally made to be more expensive by SIG SAUER, in the pursuit of profits.

98. On November 29, 2016, the SUBJECT HANDGUN remained substantially unchanged from the "completed product" condition in which the SUBJECT HANDGUN was transferred by SIG SAUER to co-Defendant, DANA SUPPLY before then being sold to Sgt. Powers' employer.

99. For the reasons set forth herein, the SUBJECT HANDGUN was unreasonably dangerous to foreseeable users, including Plaintiffs.

100. **CAUSATION.** The defects, described herein, did directly and proximately cause the injuries suffered by Sgt. Powers in that the defects did directly and in natural and continuous sequence, produce or contribute substantially to Sgt. Powers' injuries.

101. **DAMAGES.** As a direct and proximate result of the defects described herein, Sgt. Powers was injured in and about the body and suffered, *inter alia*: permanent injury, disability, disfigurement, scarring, pain and suffering, aggravation of preexisting conditions, loss of past wages, loss of future earning capacity, mental anguish, loss of enjoyment of life, and medical expenses in the care of treatment of said injuries. All injuries are permanent within a reasonable degree of medical probability and will require future medical treatment. Plaintiff will continue to suffer damages in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, SIG SAUER, INC., including for an award of damages in an amount in excess of the jurisdictional limit of this Court—thirty thousand dollars—and for all other damages to which Plaintiffs are legally entitled, along with all fees, costs, and interest as allowable by law, and for all other such other relief as this Honorable Court deems just and proper. Respectfully, Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

**COUNT III**
**NEGLIGENCE OF DANA SAFETY SUPPLY, INC.**

102. Plaintiffs reallege paragraphs 1 through 101, as if fully set forth herein.

103. Prior to the Involuntary Misfire, Defendant, DANA SUPPLY, knew—or in the exercise of due care, should have known—that the SUBJECT HANDGUN would be used in the condition and manner in which the SUBJECT HANDGUN was used on the day and at the time of the Involuntary Misfire.

104. Accordingly, DANA SUPPLY created a foreseeable zone of risk that ordinary users of the SUBJECT HANDGUN and all bystanders within range of a bullet would be harmed by the SUBJECT HANDGUN, including by one or more of the unreasonably dangerous conditions present within the SUBJECT HANDGUN, as outlined herein.

105. More egregiously, DANA SUPPLY continued to sell SIG SAUER firearms as SIG SAUER targeted law enforcement officers, members of the U.S. Military, and domestic intelligence officers—individuals at a higher risk of being struck, injured, and/or killed by a defective firearm and who use their assigned firearms under the most extreme conditions—thereby creating a heightened foreseeable zone of risk that the aforementioned individuals and all bystanders within range of a bullet would be harmed by the SUBJECT HANDGUN, including by one or more of the unreasonably dangerous conditions present within the SUBJECT HANDGUN, as outlined herein.

106. Specifically, DANA SUPPLY created a foreseeable zone of risk that users—including Sgt. Powers—as well as bystanders near the SUBJECT HANDGUN would be catastrophically injured or killed by any involuntary misfire of the SUBJECT HANDGUN, including during use, handling, movement, assembly, disassembly, loading, or unloading of the same.

107.     Such an involuntary misfire was foreseeable to DANA SUPPLY, as SIG SAUER
had designed and manufactured the SUBJECT HANDGUN in such a way as to freely permit
involuntary misfire during use, handling, movement, assembly, disassembly, loading, or
unloading—a condition which serves no utility whatsoever.

108.     At the same time that DANA SUPPLY foresaw involuntary misfires, SIG SAUER
knowingly embarked on a marketing campaign which mislead the general public as well as
hundreds of thousands of end users, including Sgt. Powers and other Captive Users—law
enforcement officers, members of the U.S. Military, and domestic intelligence officers—who were
powerless to select a weapon of their own choosing.

109.     Beyond the Captive Users, SIG SAUER misrepresented information to police
departments and sheriff's offices across the United States, misstating or omitting critical facts then
known to SIG SAUER.

110.     Ultimately, SIG SAUER's marketing campaign discouraged end users from
searching out and/or selecting safer alternatives to the P320 handgun platform, while also
discouraging end users from taking part in SIG SAUER's "Voluntary Upgrade" program.

111.     On November 29, 2016, the SUBJECT HANDGUN misfired while being handled
in accordance with all accepted handgun safety practices, resulting in the serious and permanent
injury of Sgt. Powers.

112.     Prior to that Involuntary Misfire, DANA SUPPLY was presented with multiple
opportunities to prevent avoidable damage caused by the conduct and omissions of SIG SAUER,
including by simply refusing to act as a conduit for sale of the defective P320 handgun platform;
instead, DANA SUPPLY accepted monies from SIG SAUER and/or purchasers influenced by SIG
SAUER, in exchange for provision of an unreasonably dangerous firearm.

113. **DUTY.** Defendant, DANA SUPPLY, had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings and instructions for, package, distribute, and sell the SUBJECT HANDGUN in a reasonably safe condition so as not to present a danger to end users—including Sgt. Powers—and/or bystanders who reasonably and expectedly, under ordinary circumstances, would come into contact with the SUBJECT HANDGUN.

114. **BREACH.** Defendant, DANA SUPPLY, breached its duty to Plaintiff in one or more of the following ways:

    a. Selling the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including through:

        i. Failing to sell the SUBJECT HANDGUN with an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        ii. Failing to sell the SUBJECT HANDGUN with a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        iii. Failing to sell the SUBJECT HANDGUN with adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        iv. Failing to sell the SUBJECT HANDGUN with adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        v. Failing to sell the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

        vi. Failing to sell the SUBJECT HANDGUN with internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

        vii. Failing to sell the SUBJECT HANDGUN with component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

      viii.   Failing to sell the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN; and/or

      ix.   Failing to sell the SUBJECT HANDGUN without one or more of the foregoing conditions rectified.

b.  Making the SUBJECT HANDGUN and component parts available to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users, without adequate warning of the unreasonably dangerous and defective nature of the SUBJECT HANDGUN which permits the SUBJECT HANDGUN to involuntarily misfire, including through:

      i.   Failing to adequately warn of the lack of external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

      ii.   Failing to adequately warn of the lack of trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

      iii.   Failing to adequately warn of the lack of adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

      iv.   Failing to adequately warn of the lack of redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

      v.   Failing to adequately warn of the lack of safety systems capable of preventing a discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

      vi.   Failing to adequately warn of the lack of internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

      vii.   Failing to adequately warn of the use of component parts which were improperly sized, of incorrect dimension, and which were far too heavy, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable;

      viii.   Failing to adequately warn of the use of raw materials which were not capable of enduring the ordinary forces associated with repeated cartridge discharge, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable; and/or

    ix.   Failing to warn that the SUBJECT HANDGUN was being sold without one or more of the foregoing conditions rectified.

c.  Marketing, promoting, advertising, and representing to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users that the SUBJECT HANDGUN was reasonably safe for use, handling, movement, assembly, disassembly, loading, and unloading when, in reality, basic and reasonably foreseeable use causes the SUBJECT HANDGUN to involuntarily misfire;

d.  Marketing, promoting, advertising, and representing to the general public, Captive Users, and those individuals responsible for selecting weapons carried by Captive Users that the SUBJECT HANDGUN was reasonably safe for use, handling, movement, assembly, disassembly, loading, and unloading when, in reality, a safer alternative was readily available and feasible—including but not limited to the "light-weight striker" which SIG SAUER readily admits was, prior to November 29, 2016, limited to "higher end 320s, like the X-Series line," and which SIG SAUER intentionally made more expensive in exchange for, *inter alia*, safety systems;

e.  Failing to properly assemble, test, inspect, label, package, and otherwise place the SUBJECT HANDGUN on the market for sale in a defect-free condition, thereby creating an unreasonable danger of injury or death to users and bystanders within range of a bullet, even under normal and foreseeable circumstances;

f.  Failing to warn, notice, or alert purchasers and users (or doing so inadequately) either before, during, and/or after the sale of the SUBJECT HANDGUN through reasonably informative and effective instructional materials, stickers, placards, and/or other documentation regarding hazardous conditions, including those described herein;

g.  Failing to instruct (or inadequately instructing) buyers, installers, inspectors, maintenance providers, contractors, and eventual owners or end users of the SUBJECT HANDGUN with regard to proper handling, use, assembly, disassembly, loading, and unloading of the SUBJECT HANDGUN; and/or

h.  Failing to inspect, test, review, or examine the SUBJECT HANDGUN, including all component parts to ensure the SUBJECT HANDGUN would operate in a reasonably safe

manner when the SUBJECT HANDGUN left SIG SAUER's possession.

115. **CAUSATION.** The negligence of DANA SUPPLY, described above, did directly and proximately cause the injuries suffered by Sgt. Powers, and thus the damages of Plaintiffs, in that DANA SUPPLY's negligence did directly, in natural and continuous sequence, produce or contribute substantially to the physical injuries and associated damages of Plaintiffs.

116. **DAMAGES.** As a direct and proximate result of the DANA SUPPLY's negligence, Sgt. Powers was injured in and about the body and suffered, *inter alia*: permanent injury, disability, disfigurement, scarring, pain and suffering, aggravation of preexisting conditions, loss of past wages, loss of future earning capacity, mental anguish, loss of enjoyment of life, and medical expenses in the care of treatment of said injuries. All injuries are permanent within a reasonable degree of medical probability and will require future medical treatment. Plaintiff will continue to suffer damages in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, DANA SAFETY SUPPLY, INC., including for an award of damages in an amount in excess of the jurisdictional limit of this Court—thirty thousand dollars—and for all other damages to which Plaintiffs are legally entitled, along with all fees, costs, and interest as allowable by law, and for all other such other relief as this Honorable Court deems just and proper. Respectfully, Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

**COUNT IV**
**STRICT LIABILITY OF DANA SAFETY SUPPLY, INC.**

117. Plaintiffs reallege paragraphs 1 through 101, as if fully set forth herein.

118. **THE BUSINESS.** Defendant, DANA SUPPLY, is engaged in the business of marketing, advertising, selling, and distributing firearms, including the SUBJECT HANDGUN as

part of "P320" handgun platform sales made possible by co-Defendant, SIG SAUER, since approximately 2014.

119.   **THE PRODUCT.** DANA SUPPLY placed the SUBJECT HANDGUN on the market along with approximately 500,000 other P320s knowing that the SUBJECT HANDGUN was reasonably likely to be used without inspection for defects and dangers by the end user.

120.   Specifically, DANA SUPPLY knew or should have known that end users would not and could not properly inspect the SUBJECT HANDGUN for defects and dangerous conditions and that the detection of such defects and dangers would be beyond the capabilities of such persons.

121.   **THE DEFECTS.** The SUBJECT HANDGUN was defective and unreasonably dangerous to end users—including Sgt. Powers—as well as bystanders within range of a bullet at the time that DANA SUPPLY marketed, sold, and/or distributed the SUBJECT HANDGUN and, at that same time, the SUBJECT HANDGUN was defective at the time it was sold by DANA SUPPLY to the government of Holmes Beach, as the result of one or more of the following:

    a.  **Design Defect.**  SIG SAUER designed the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including by:

        i.  Failing to design an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        ii.  Failing to design a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        iii.  Failing to design adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        iv.  Failing to design adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

        v.  Failing to design the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi. Failing to adequately design the internal components of the SUBJECT HANDGUN so as to prevent the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii. Failing to design component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

viii. Failing to design the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN;

ix. Permitting the SUBJECT HANDGUN to be manufactured without one or more of the foregoing conditions rectified;

x. Failing to properly assemble, inspect, and test, prior to November 29, 2016, the entire P320 line including prototypes and the design stage and other similar weapons platforms like the P250, such that ordinary use would permit the SUBJECT HANDGUN to involuntarily misfire without warning; and/or

xi. Failing to recall the SUBJECT HANDGUN as defectively designed or, alternatively, to warn of the same.

b. **Manufacturing Defect.** SIG SAUER manufactured the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including by:

i. Failing to manufacture the SUBJECT HANDGUN with an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii. Failing to manufacture the SUBJECT HANDGUN with a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii. Failing to manufacture the SUBJECT HANDGUN with adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv. Failing to manufacture the SUBJECT HANDGUN with adequate redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v. Failing to manufacture the SUBJECT HANDGUN in such a manner as to prevent any discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi. Failing to manufacture the SUBJECT HANDGUN with internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii. Failing to manufacture the SUBJECT HANDGUN with component parts of proper size, dimension, and weight so as to prevent involuntary misfire of the SUBJECT HANDGUN;

viii. Failing to manufacture the SUBJECT HANDGUN in such a manner as to require the use of only raw materials which are capable of enduring the ordinary forces associated with repeated cartridge discharge without also permitting involuntary misfire of the SUBJECT HANDGUN;

ix. Failing to manufacture the SUBJECT HANDGUN without one or more of the foregoing conditions rectified;

x. Failing to properly assemble, inspect, and test the SUBJECT HANDGUN such that ordinary use would permit the SUBJECT HANDGUN to involuntarily misfire without warning; and/or

xi. Failing to recall the SUBJECT HANDGUN as defectively manufactured or, alternatively, to warn of the same.

c. **Sale/Distribution of Defective Product.** DANA SUPPLY and SIG SAUER sold and/or distributed the SUBJECT HANDGUN and component parts in such an unreasonably dangerous and defective manner as to permit the SUBJECT HANDGUN to involuntarily misfire, including by:

i. Failing to sell the SUBJECT HANDGUN with an external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii. Failing to sell the SUBJECT HANDGUN with a trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii. Failing to sell the SUBJECT HANDGUN with adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv. Failing to sell the SUBJECT HANDGUN with adequate redundant safeties or similar devices capable of

preventing involuntary misfire of the SUBJECT
HANDGUN;

v.   Failing to sell the SUBJECT HANDGUN in such a
manner as to prevent any discharge when the SUBJECT
HANDGUN is capable of an involuntary misfire;

vi.   Failing to sell the SUBJECT HANDGUN with internal
components capable of preventing the movement of any
firing mechanism internal component part unless the
trigger is first pulled, thereby preventing involuntary
misfire of the SUBJECT HANDGUN;

vii.   Failing to sell the SUBJECT HANDGUN with
component parts of proper size, dimension, and weight
so as to prevent involuntary misfire of the SUBJECT
HANDGUN;

viii.   Failing to sell the SUBJECT HANDGUN in such a
manner as to require the use of only raw materials which
are capable of enduring the ordinary forces associated
with repeated cartridge discharge without also
permitting involuntary misfire of the SUBJECT
HANDGUN; and/or

ix.   Failing to sell the SUBJECT HANDGUN without one or
more of the foregoing conditions rectified.

d.   **Failure to Warn of Defective Product.** DANA SUPPLY and
SIG SAUER made the SUBJECT HANDGUN and component
parts available to the general public, Captive Users, and those
individuals responsible for selecting weapons carried by Captive
Users, without adequate warning of the unreasonably dangerous
and defective nature of the SUBJECT HANDGUN permitting
the SUBJECT HANDGUN to involuntarily misfire, including
by:

i.   Failing to adequately warn of the lack of external safety
capable of preventing involuntary misfire of the
SUBJECT HANDGUN;

ii.   Failing to adequately warn of the lack of trigger safety
capable of preventing involuntary misfire of the
SUBJECT HANDGUN;

iii.   Failing to adequately warn of the lack of adequate
internal safety mechanisms capable of preventing
involuntary misfire of the SUBJECT HANDGUN;

iv.   Failing to adequately warn of the lack of redundant
safeties or similar devices capable of preventing
involuntary misfire of the SUBJECT HANDGUN;

v.   Failing to adequately warn of the lack of safety systems
capable of preventing a discharge when the SUBJECT
HANDGUN is capable of an involuntary misfire;

vi.    Failing to adequately warn of the lack of internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii.    Failing to adequately warn of the use of component parts which were improperly sized, of incorrect dimension, and which were far too heavy, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable;

viii.    Failing to adequately warn of the use of raw materials which were not capable of enduring the ordinary forces associated with repeated cartridge discharge, thereby making involuntary misfire of the SUBJECT HANDGUN foreseeable; and/or

ix.    Failing to warn that the SUBJECT HANDGUN was being sold without one or more of the foregoing conditions rectified.

e.    **Post-Sale Duty to Warn of Defective Product.**  After the dangerous and defective condition of its P320 platform became known to SIG SAUER and/or DANA SUPPLY—including and affecting the Subject Firearm—DANA SUPPLY failed to adequately warn anyone of the  unreasonably dangerous and defective nature of the SUBJECT HANDGUN permitting the SUBJECT HANDGUN to involuntarily misfire, including by:

i.    Failing to adequately warn of the lack of external safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

ii.    Failing to adequately warn of the lack of trigger safety capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iii.    Failing to adequately warn of the lack of adequate internal safety mechanisms capable of preventing involuntary misfire of the SUBJECT HANDGUN;

iv.    Failing to adequately warn of the lack of redundant safeties or similar devices capable of preventing involuntary misfire of the SUBJECT HANDGUN;

v.    Failing to adequately warn of the lack of safety systems capable of preventing a discharge when the SUBJECT HANDGUN is capable of an involuntary misfire;

vi.    Failing to adequately warn of the lack of internal components capable of preventing the movement of any firing mechanism internal component part unless the trigger is first pulled, thereby preventing involuntary misfire of the SUBJECT HANDGUN;

vii.   Failing to adequately warn of the use of component parts
       which were improperly sized, of incorrect dimension,
       and which were far too heavy, thereby making
       involuntary misfire of the SUBJECT HANDGUN
       foreseeable;

viii.  Failing to adequately warn of the use of raw materials
       which were not capable of enduring the ordinary forces
       associated with repeated cartridge discharge, thereby
       making involuntary misfire of the SUBJECT
       HANDGUN foreseeable; and/or

ix.    Failing to warn that the SUBJECT HANDGUN was
       being sold without one or more of the foregoing
       conditions rectified.

f.   **Marketing and Advertising.**   DANA SUPPLY and SIG
     SAUER marketed, promoted, advertised, or otherwise
     represented that the SUBJECT HANDGUN was reasonably safe
     for use, handling, movement, assembly, disassembly, loading,
     and unloading when, in reality, foreseeable use alone permits the
     SUBJECT HANDGUN to involuntarily misfire; in so doing,
     DANA SUPPLY and SIG SAUER marketed, promoted,
     advertised, and represented that the SUBJECT HANDGUN was
     reasonably safe for use, handling, movement, assembly,
     disassembly, loading, or unloading when, in reality, a safer
     alternative was readily available and feasible from DANA
     SUPPLY and SIG SAUER, but that that safer alternative was
     intentionally made to be more expensive by SIG SAUER and, in
     turn, DANA SUPPLY, in the pursuit of profits.

122.   On November 29, 2016, the SUBJECT HANDGUN remained substantially
unchanged from the "completed product" condition in which the SUBJECT HANDGUN was
transferred by DANA SUPPLY to the government of Holmes Beach.

123.   For the reasons set forth herein, the SUBJECT HANDGUN was unreasonably
dangerous to foreseeable users, including Plaintiffs.

124.   **CAUSATION.** The defects, described herein, did directly and proximately cause
the injuries suffered by Sgt. Powers in that the defects did directly and in natural and continuous
sequence, produce or contribute substantially to Sgt. Powers' injuries.

125. **DAMAGES.** As a direct and proximate result of the defects described herein, Sgt. Powers was injured in and about the body and suffered, *inter alia*: permanent injury, disability, disfigurement, scarring, pain and suffering, aggravation of preexisting conditions, loss of past wages, loss of future earning capacity, mental anguish, loss of enjoyment of life, and medical expenses in the care of treatment of said injuries. All injuries are permanent within a reasonable degree of medical probability and will require future medical treatment. Plaintiffs will continue to suffer damages in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant, DANA SAFETY SUPPLY, INC., including for an award of damages in an amount in excess of the jurisdictional limit of this Court—thirty thousand dollars—and for all other damages to which Plaintiffs are legally entitled, along with all fees, costs, and interest as allowable by law, and for all other such other relief as this Honorable Court deems just and proper. Respectfully, Plaintiffs hereby demand a trial by jury on all issues so triable as a matter of right.

## COUNT V
## SPOUSAL LOSS OF CONSORTIUM BY TAMMY POWERS

126. Plaintiff, Tammy Powers, realleges paragraphs 1 through 125, as if fully set forth herein.

127. **MARRIAGE.** At all times relevant to this cause of action, Tammy Powers was legally married to and cohabitant with Plaintiff, Kevin Powers.

128. **BREACH.** The negligence of Defendants, SIG SAUER and/or DANA SUPPLY, described herein, did directly and in natural and continuous sequence, produce or contribute substantially to Sgt. Powers' injuries.

129. **LEGAL CAUSATION.** The negligence of Defendants, SIG SAUER and DANA SUPPLY, described herein, did directly and proximately cause the loss of consortium damages to Tammy Powers, as described herein.

130. **DAMAGES.** As a result of the negligence of SIG SAUER and DANA SUPPLY and the resulting injuries to Sgt. Powers, Tammy Powers has suffered and will continue to suffer:

a. the loss of the companionship and fellowship of husband and wife, including the affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance of her husband;
b. the loss of the support and financial comfort which was furnished to her by her husband prior to Defendant's negligence which caused a reduction in earned livelihood; and
c. loss of the enjoyment of life as caregiver which limits or restricts her normal activities in the enjoyment of life.

**WHEREFORE,** Plaintiff, Tammy Powers, demands judgment against Defendants, SIG SAUER, INC. and DANA SAFETY SUPPLY, INC., including for an award of damages in an amount in excess of the jurisdictional limit of this Court—thirty thousand dollars—and for all other damages to which Plaintiff is legally entitled, along with all fees, costs, and interest as allowable by law, and for all other such other relief as this Honorable Court deems just and proper. Respectfully, Plaintiff hereby demands a trial by jury on all issues so triable as a matter of right.

**Respectfully Submitted,** this 14th day of May, 2020.

/s/
**C. RICHARD NEWSOME, ESQ.**
Florida Bar No.: 827258
**NICHOLAS S. GURNEY, ESQ.**
Florida Bar No. 125013
**NEWSOME | MELTON**
201 South Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile: (407) 648-5282
*Emails for service:* gurney@newsomelaw.com
gurneyservice@newsomelaw.com